IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


SPIROS KONTOS,                     :               Case No.1:12 CV 02641

          Plaintiff,              :

v.                                 :

COMMISSIONER OF SOCIAL SECURITY,   :               MEMORANDUM DECISION
                                                    AND ORDER
          Defendant.              :


## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties

consented to have the undersigned Magistrate Judge conduct all proceedings in this case and order

the entry of final judgment.  Plaintiff seeks judicial review of Defendant's final determination

denying his claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act

(Act).  Pending for review are the Briefs filed by the parties (Docket Nos. 11 & 12).  For the reasons

that follow, the Magistrate Judge affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On October 17, 2008, Plaintiff completed an application for DIB, in which he alleged that

he became unable to work because of his disabling condition due to back problems beginning on

May 21, 2004 (Docket No. 7, pp. 121-122 of 507).  The application was denied initially and upon

reconsideration (Docket No. 7, pp. 104; 106; 108 of 507).  Plaintiff made a timely request for

hearing before an Administrative Law Judge (ALJ) and on December 14, 2010, ALJ Pamela E. Loesel conducted a hearing in Cleveland, Ohio, at which Plaintiff, represented by counsel, and Vocational Expert (VE) Deborah Lee appeared (Docket No. 7, pp. 21; 68 of 507).  On April 25, 2011, the ALJ issued her decision finding that Plaintiff had not been disabled within the meaning of the Act at any time from the alleged onset date through the date of the decision (Docket No. 7, pp. 22-31 of 507).  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 11, 2012, and the ALJ's decision became the final decision of the Commissioner (Docket No. 7, pp. 6-8 of 507).

A.      THE ADMINISTRATIVE HEARING.

At the hearing before ALJ Loesel,  Plaintiff and the VE testified.

1.      PLAINTIFF'S TESTIMONY

Plaintiff completed the sixth grade in Greece.  He could speak English but he could not read English.  During the past thirty years, Plaintiff resided in the same home with his wife and daughters.  Although he was able to drive, Plaintiff had not driven in two to three weeks prior to the hearing.  His daughter drove him to the hearing (Docket No. 7, pp. 77, 85 of 507).

 Plaintiff and his brother owned a Farmer Boy Restaurant for 23 years.  Plaintiff cooked all day, ordered supplies and planned menus, while also supervising 20 to 23 employees.  In 2004, Plaintiff's doctor advised him that he could no longer meet the physical demands associated with the restaurant; therefore,  he sold the business (Docket No. 7, pp. 78-79; 86 of 507).  Plaintiff applied for work at Applebee's but after orientation with the manager, he left because his back pain was so intense (Docket No. 7, p. 87 of 507).  For fourteen or sixteen months, Plaintiff volunteered his services at his brother's restaurant by advising the cook for up to fifteen hours weekly (Docket No.

2

7, p. 91 of 507).

After selling the restaurant which he co-owned with his brother, Plaintiff underwent surgery in 2004. However, he continued to experience very sharp pain in his back which radiated down his right leg. He occasionally experienced numbness in his right leg (Docket No. 7, pp. 80-81 of 507). In an effort to stop and/or reduce his pain, Plaintiff had undergone acupuncture and received cortisone shots. Now, he took Advil every six hours and exercised at a recreational center for approximately 30 minutes (Docket No. 7, pp. 77, 81, 89 of 507). Plaintiff had called t\Chisle

Between 2004 and October 2008, Plaintiff estimated that he could stand up for approximately fifteen minutes before he had to change positions. Because the pain radiated from his back to his leg and he couldn't walk "right" or stay on his feet, Plaintiff used a cane to ambulate. He lifted "absolutely nothing," did not help out around the house and was in the bed up to five hours per day. The pain interrupted his ability to sleep (Docket No. 7, pp. 82, 83, 84, 85 of 507).

### 2. THE VE'S TESTIMONY.

VE Lee, a vocational rehabilitation counselor, stated that her testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT) and its companion publication SELECTED CHARACTERISTICS OF OCCUPATIONS (Docket No. 7, pp. 93, 98 of 507).

Initially, the VE categorized Plaintiff's past work as an owner and predominately a cook at a restaurant. The job of cook, described at DOT 313.361-014, was a skilled, medium demand occupation with a Specific Vocational Preparation (SVP) of seven. SVP describes the amount of time the typical worker could learn the techniques, acquire the information, and develop the facility needed for average performance in the specified job. The level seven denotes that to learn, and develop skills as an average cook required a period of time that exceeded two years up to and

3

including four years (Docket No. 7. pp. 94-95 of 507; www.onetonline.org/help/online/svp.)

From 1980 through 2004, Plaintiff was also the owner of the restaurant.  The VE classified this occupation as a food service manager, described in DOT 187.167-106.  Such job was skilled and required a light level of exertion.  The SVP for this job was also seven.  The managerial skills did not transfer to sedentary work; however, there were some light cooking jobs that would accommodate these skills (Docket No. 7, p. 95 of 507).

The ALJ asked the VE to consider a hypothetical individual who was the same age, had the same educational background, had the same past work experience as Plaintiff and had these limitations that could restrict work activities:

1.  Occasionally lifting 20 pounds.

2.  Frequently lifting 10 pounds.

3.  Standing and walking six hours out of an eight-hour workday.

4.  Unlimited pushing and pulling.

5.  Occasionally climbing ramps and stairs.

6.  Never climbing a ladder, rope or scaffolds.

7.  Occasionally balancing, stooping, kneeling, crouching and crawling.

8.  Avoiding all exposure to hazards such as machinery and heights.

With respect to whether this hypothetical individual could perform Plaintiff's past relevant work as those occupations were generally performed in the national economy, the VE explained that Plaintiff performed this work at the medium level of exertion and he could no longer perform at that level.  His past work as a cook/restaurant owner would exceed the exertional demands for light work.  Furthermore, the VE explained that several of the food service director positions, i.e., manager of

fast food, were considered light exertion and semiskilled work.  The typical worker could learn the techniques, acquire the information, and develop the facility needed for average performance as a food service director at a level of time that exceeded six months up to an including one year (Docket No. 7, pp. 95-96 of 507; www.onetonline.org/help/online/svp).

Under the statistical category of *food service manager*, these are the titles of jobs identified under DOT as light work, their SVP and the numbers of jobs available in the economy that would accommodate the limitations of this hypothetical plaintiff:

| JOB/DOT | SVP | CLEVELAND METROPOLITAN STATISTICAL AREA (MSA)/ OHIO/USA |
|---------|-----|---------------------------------------------------------|
| MANAGER OF FAST FOOD DOT 185.137-010 | 5.  OVER SIX MONTHS UP TO AND INCLUDING ONE YEAR | 1,500/ 8,400/ 196,000 |
| MANAGER OF INDUSTRIAL CAFETERIA DOT 319.137-018 | 6.  OVER ONE YEAR UP TO AND INCLUDING TWO YEARS | |
| MANAGER OF FOOD SERVICE DOT 187.167-106 | 7.  OVER TWO YEARS UP TO AND INCLUDING FOUR YEARS | |

Under *light-type cooking positions,* there would be the following position available in the economy that would accommodate the limitations of this hypothetical plaintiff:

| JOB/DOT | SVP | CLEVELAND MSA/OHIO/USA |
|---------|-----|------------------------|
| Short order cook DOT 313.374-014 | 3.  Over one month up to and including 3 months | 950/  6,900/   168,700 |

(Docket No. 7, p. 97 of 507).

5

### III. TREATMENT HISTORY.

The ALJ must consider Plaintiff's subjective testimony about symptoms and the inability to work and perform activities and the VE's objective testimony.  In addition, the ALJ must also consider and weigh all of the medical evidence that tends to prove disability within the meaning of the Act.  A summary follows of medical evidence presented by Plaintiff that was material to the ALJ's determination of disability.

Dr. Stephen J. Schnell, M.D., an internal medicine specialist, removed compacted earwax on June 1, 2001 (Docket No. 7, pp. 223 of 507).

On August 21, 2001, Dr. John Collis, M. D., a neurosurgeon, diagnosed Plaintiff with degenerated L4 disc with herniation and/or stenosis (Docket No. 7, p. 321 of 507).

On September 25, 2001, Dr. Collis supplemented his earlier diagnosis of lumbar canal stenosis with a recommendation that Plaintiff undergo a lumbar decompressive laminectomy and foraminotomy, a surgical procedure that is performed on the lower spine to relieve pressure on one of the nerve roots, enlarging the intervertebral foramen, allowing ample space for the nerves and eliminating compression (Docket No. 7, p. 322 of 507; STEDMAN'S MEDICAL DICTIONARY 152820; 103990; 222280 (27th ed. 2000)).

Dr. Schnell treated the symptoms of pharyngitis on April 12, 2002 (Docket No. 7, pp. 223 of 507).

Plaintiff presented to Dr. Schnell with complaints that he became dizzy when bending.  From blood samples collected on May 16, 2003, Dr. Schnell determined that Plaintiff's blood urea nitrogen, cholesterol and potassium levels exceeded the reference range for healthy individuals (Docket No. 7, pp. 223; 246 of 507).

On February 18, 2004, Plaintiff presented to Dr. Schnell with complaints of right chest wall

and abdominal pain.  The chest xrays showed eventration (protrusion of omentum and/or intestine through an opening in the abdominal wall) of the right hemidiaphragm and increased interstitial markings in the left lower lung that could represent infiltrate as opposed to atelectasis (decreased or absent air in the entire or part of the lung) and/or fibrotic changes.  Results from the xrays of the lateral rib area suggested gallstones causing Dr. Schnell to order an ultrasound (Docket No. 7, p. 245, 246, 247 of 507; STEDMAN'S MEDICAL DICTIONARY 141700; 36120 (27th ed. 2000)).

The transabdominal screening ordered by Dr. Schnell was conducted on March 24, 2004.  The results showed a normal liver, gallbladder, pancreas and spleen.  The results also showed a 7mm cyst on the middle pole of the right kidney (Docket No. 224; 244 of 507).

On April 28, 2004, Dr. Michael T. Barkoukis, M.D., a urologist, examined Plaintiff's right flank pain that was localized over Plaintiff's lower rib cage in the mid-axillary line.  The ultrasound revealed a larger cyst projecting off the left kidney that appeared benign except for the septation (Docket No. 7, p. 236 of 507; www.healthgrades.com/physician.dr-michael-barkoukis-xc5fd).

Dr. Collis examined Plaintiff on May 4, 2004, focusing on the episodic severe pain.  A repeat magnetic resonance imaging (MRI) was ordered to confirm Dr. Collis' suspicions that Plaintiff had a lumbar disc herniation and thoracic lesion (Docket No. 7, p. 243 of 507).

On May 6, 2004, Dr. Collis opined that "the diagnosis is episodically the pain is severe; he had severe stenosis at L3 and L4; multiple degenerated discs."  Dr. Collis reiterated his recommendation that Plaintiff undergo a lumbar decompressive laminectomy and foraminotomy (Docket No. 7, p. 242 of 507).

On May 6, 2004, Dr. Virginia C. Poirier, M. D., a neuroradiologist, focused on characterizing abnormalities of the central and peripheral nervous system when interpreting the results from the

MRI.  She determined that:

1.  At L1-2, 2-3 and L5-S1, there were normal disc heights and normal disc signal intensity with no evidence of disc bulge, central canal stenosis or neural foraminal narrowing.

2.  At L3-4, there were normal disc heights with loss of T2 disc signal intensity and a tiny posterior disc bulge with some high signal intensity in this posterior region on the T2 weighted sequence indicating an annular tear**.**  There was a mild degree of central canal stenosis at L3-4.

3.  At L4-5, there were a moderate degree of disc space narrowings with loss of T2 disc signal intensity and a mild degree of central canal stenosis at L4-5 (Docket No. 7, pp. 324-325 of 507; www.healpth.com/doctors/virginia-poirier-406766/.www.medterms.com).

On May 18, 2004, the results from the electrocardiogram showed normal sinus rhythm but Plaintiff's potassium level was lower than the normal reference range  in healthy individuals (Docket No. 7, pp. 260; 261 of 507).

On May 21, 2004, Plaintiff underwent surgery consisting of lumbar decompression, bilateral L4 laminotomy with bilateral L4-L5 foraminotomy with lysis of chronic adhesions and bilateral L3 laminotomy (Docket No. 7, pp. 319-320; 435-436 of 507).

On September 2, 2004, Plaintiff presented to Dr. Schnell with an acute attack of "room spinning."  Dr. Schnell diagnosed Plaintiff with vertigo and prescribed a medication used to treat hypertension (Docket No. 7, p. 224 of 507).

Plaintiff presented to Dr. Collis on September 28, 2004, with upper lumbar pain.  Upon examination, Dr. Collis diagnosed Plaintiff with generalized osteoarthritis and status post lumbar laminectomy and recommended that Plaintiff undergo a rheumatology consultation (Docket No. 7, pp. 239- 240 of 507).

Dr. Young H. Kim, M. D., administered a lumbosacral epidural block on October 7, 2004 and a lumbar paraspinal block on November 4, 2004 (Docket No. 7, pp. 485, 486 of 507).

8

Dr. Barkoukis conducted a follow-up computed tomography (CT) scan of Plaintiff's kidneys on November 2, 2004.  The left renal cyst was reported to be thin walled and contained no calcium, masses or malignant characteristics (Docket No. 11, p. 238 of 507).

Dr. Kim administered a lumbar block on November 4, 2004 (Docket No. 7, pp. 399; 428-430; 437 of 507).

On November 30, 2004, Dr. Schnell noted that Plaintiff lungs were clear and his chest pressure was normal (Docket No. 7, p. 224 of 507).

On December 15, 2004, Plaintiff was experiencing chest pain so he was examined to determine cardiac insufficiency.  The results from a Dual isotope exercise stress and gated imaging test showed marginal functional aerobic capacity with no chest pain reported and no significant electrocardiography changes indicative of myocardial ischemia (Docket No. 7, pp. 237; 265 of 507).

Dr. Ronald C. Watson, a chiropractor, conducted an evaluation on February 21, 2005 to ascertain the severity of Plaintiff's lower and upper back pain.  Dr. Watson applied manipulation from February 21, 2005 through June 10, 2005, yet the pain persisted (Docket No. 7, pp. 280-285 of 507).  Dr. Robert E. Norris, M.D., completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT on June 3, 2005.  Based on the primary diagnosis of degenerative discogenic disease of the L-spine with radiculopathy and his reasoned judgment, Dr. Norris opined that Plaintiff had no communicative, environmental, manipulative or visual limitations resulting from his impairments. Otherwise, Plaintiff's impairments limited him to:

1.  Occasionally lifting and/or carrying twenty pounds.

2.  Frequently lifting and/or carrying ten pounds.

3.  Standing and/or walking for a total of about six hours in an 8-hour workday.

4.  Sitting for a total of about six hours in an 8-hour workday.

9

5. Engaging in unlimited pushing and/or pulling, other than as shown for lifting and carrying.

6. Never climbing using a ladder/rope/scaffold.

7. Frequently climbing using a ramp or stairs.

8. Frequently balancing, stooping, kneeling, crouching and crawling (Docket No. 7, pp. 269-276 of 507).

Plaintiff was involved in a vehicle accident on October 31, 2005. He suggests that the impact from the accident caused his pain to worsen (Docket No. 7, p. 382 of 587).

Dr. Timothy A. Scroggins, M. D., a family practitioner, requested an MRI on January 11, 2006. The results showed postoperative changes at L3-4 and L4-5 and small left paracentral disk herniation at L4-5 (Docket No. 7, pp. 503-507 of 507; www.healthgrades.com/physician/dr-timothy-scroggins-y23dh).

On October 23, 2006, Plaintiff complained that he had excessive flatulence and burping. Dr. Schnell diagnosed Plaintiff with gastroesophageal reflux disease (GERD) and prescribed Prilosec, a medication used specifically to treat GERD (Docket No. 7, p. 225 of 507; www.drugs.com).

On March 29, 2007, Dr. Schnell addressed an abnormal increase in Plaintiff's bad cholesterol or low density lipoprotein (LDL). Dr. Schnell prescribed Vytorin, a medication used to lower LDL (Docket No. 7, p. 225 of 507; webmd.com).

Plaintiff presented to Dr. Scroggins for follow-up on back pain and ear complaints on April 18, 2007. Dr. Scroggins granted Plaintiff's request for joint injections to relieve bilateral S1 joint pain and prescribed a Lidoderm patch (Docket No. 7, p. 288 of 507).

From July 30, 3007 to December 3, 2007, Plaintiff underwent an hour of acupuncture twice monthly. Acupuncture did not alleviate the chronic pain (Docket No. 7, pp. 293-304 of 507).

10

Plaintiff presented to Dr. Collis on February 26, 2008, with complaints of mid and lower back pain with numbness of the right leg and foot and Dr. Collis diagnosed Plaintiff with post-lumbar laminectomy syndrome.  He noted that there was evidence of disc degeneration of L3 without canal compromise or focal protrusion and that Plaintiff had a narrow sclerotic L4 interspace.  Dr. Collis could not rule out that Plaintiff had a herniated lumbar disc (Docket No. 7, pp. 232-234; 312; 385 of 507).

After another MRI had been administered, Dr. Collis reexamined Plaintiff on March 4, 2008 and affirmed that Plaintiff had degenerated L3 and L4 discs post-lumbar laminectomy state (Docket No. 7, p. 231 of 507).

On March 7, 2008, Plaintiff underwent a dual-energy X-ray absorptiometry (DEXA Scan), a quantitative ultrasound procedure used to measure bone density.  The bone mineral density of the lumbar spine was normal but the bone mineral density of the left femoral neck was consistent with decreased calcification or density of bone (Docket No. 7, p. 334 of 507; STEDMAN'S MEDICAL DICTIONARY 289330, 289180 (27th ed. 2000)).

On March 11, 2008, Dr. Kim performed an L4 discogram.  Plaintiff tolerated the procedure well.  An intradiscal injection of Depo-Medrol was administered to relieve inflammation (Docket No. 7, pp. 230; 376-382; 387-398 of 507).

Dr. Kimberly K. Thomsen, M.D., a rheumatologist, conducted a consultative examination on April 14, 2008, after which she prescribed vitamin D, calcium and Ultram, a narcotic-like pain reliever, to treat Plaintiff's pain.  She ordered further diagnostic tests including X-rays of the thoracic spine and osteopenic bones; and laboratory work to determine Plaintiff's vitamin D levels (Docket No. 7, pp. 227-228 of 507; www.drugs.com).

Dr. Collis reexamined Plaintiff on July 8, 2008 for complaints of right thigh pain and

11

numbness.  Plaintiff was authorized to undergo a right inguinal block and caudal epidural in three weeks, if needed (Docket No. 7, p. 229 of 507).

On July 17, 2008, Dr. H. Nick Huntley, M. D., a surgeon, administered an L2, L3 and L4 transforaminal injection (Docket No. 7, pp. 337; 359-375 of 507).

After he had undergone a caudal block, Dr. Schnell examined Plaintiff's blood pressure on August 1, 2008.  He also reviewed results from Plaintiff's lipid panel which showed an abnormality (Docket No. 7, p. 226 of 507).

Dr. Kim administered another caudal injection on September 2, 2008 (Docket No. 7, pp. 340 of 507).

On December 2, 2008, Dr. Eli Perencevich, D.O., completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT form.  Based on the primary diagnosis of LS post laminectomy syndrome, Dr. Perencevich opined that Plaintiff had no communicative, manipulative or visual limitations resulting from his impairment this impairment.  However, Plaintiff's impairment did limit him to:

1.  Occasionally lifting and/or carrying twenty pounds.

2.  Frequently lifting and/or carrying ten pounds.

3.  Standing and/or walking for a total of about six hours in an 8-hour workday.

4.  Sitting for a total of about six hours in an 8-hour workday.

5.  Engaging in unlimited pushing and/or pulling, other than as shown above for lifting and carrying.

6.  Never climbing using a ladder/rope/scaffold.

7.  Occasionally climbing using a ramp or stairs.

8.  Occasionally balancing, stooping, kneeling, crouching and crawling.

9.  Avoiding all exposure to hazards (machinery, heights, etc.).

(Docket No. 7, pp. 494-400 of 507).

On June 8, 2009, Dr. W. Jerry Mc Cloud, M.D., affirmed Dr. Perencevich's residual functional capacity findings for the reason that there was no medical evidence since the prior decision that would alter it (Docket No. 7, p. 502 of 507).

## IV. STANDARD OF DISABILITY.

To be eligible for DIB, a claimant must be under a "disability" as defined by the Act at 42 U.S.C. § 423(d). A "disability" includes physical and/or mental impairments that are both "medically determinable" and severe enough to prevent a claimant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. 42 U. S. C. § 423(d) (Thomson Reuters 2013). A DIB claimant bears the ultimate burden of establishing that he or she is disabled under the Act's definition. *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir.1997).

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step inquiry. 20 C.F.R. § 404.1520 (Thomson Reuters 2013). The Sixth Circuit has summarized the five steps as follows:

1. If a claimant is doing substantial gainful activity—i.e., working for profit—she or he is not disabled.

2. If a claimant is not doing substantial gainful activity, his or her impairment must be severe before she or he can be found to be disabled.

3. If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his or her impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If a claimant's impairment does not prevent him or her from doing past relevant work, she or he is not disabled.

13

5. Even if a claimant's impairment does prevent him or her from doing past relevant work, if other work exists in the national economy that accommodates his or her residual functional capacity and vocational factors (age, education, skills, etc.), he or she is not disabled.

*Smith v. Commissioner of Social Security*, 2013 WL 645535, *1 at fn. 1 (N.D.Ohio,2013) (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.1990); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir.2001)).

Importantly, the social security claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his or her age, education, past work experience and RFC.  *Garris v. Commissioner of Social Security*, 2013 WL 3990754, *6 (N.D.Ohio,2013) (*see Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir.1990)).

## V.  THE ALJ'S DECISION.

After careful consideration of the entire record, the ALJ made the following findings of fact and conclusions of law:

1. Plaintiff last met the insured status of the Act on March 31, 2009.  Plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date of May 21, 2004 though the date last insured of March 31, 2009.

2. Through the date last insured, Plaintiff had the following severe impairment:  post-laminectomy syndrome.

3. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F. R. art 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).

4. After careful consideration of the entire record, the ALJ found that through the date last insured, Plaintiff had the residual functional capacity to perform light work in that he could occasionally lift 20 pounds and frequently lift 10 pounds, was able to stand and walk for six hours out of an 8-hour workday, was able to sit for six hours out of an 8-hour workday, was unlimited in his ability to push and pull, could occasionally climb ramps and stairs, could never climb ladders, ropes and scaffolds, and could occasionally balance,

14

stoop, kneel, crouch and crawl.  Plaintiff should avoid all exposure to workplace hazards including hazardous machinery and heights.

5. Through the date last insured, Plaintiff was capable of performing past relevant work as a food service manager.  This work did not require the performance of work related activities precluded by Plaintiff's residual functional capacity.

6. Plaintiff was not under a disability, as defined in the Act from May 21, 2004, the alleged onset date, through March 31, 2009, the date last insured (Docket No. 7, pp. 13, pp. 22-31 of 507).

## V. THE STANDARD OF REVIEW.

Exclusive jurisdiction over Social Security benefit cases arises from 42 U.S.C. § 405(g), which states in relevant part that any final decision by the Commissioner of Social Security made after hearing to which the claimant is a party, is subject to [judicial] review of such decision by a civil action.  A final decision is one rendered after the claimant has completed the four-step administrative review process, the last step being a review by the Appeals Council.  20 C. F. R. § 404.900(a) (Thomson Reuters 2013).

Judicial review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 374 (6th Cir. 2013) (*citing Cole v. Astrue*, 661 F. 3d 931, 937 (6th Cir. 2011) (internal quotation marks omitted)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Heston, supra*, 245 F.3d at 534) (internal quotation marks omitted)).  A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion.  *Id.* (*citing Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir.2007)).  But "[a]n ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Id.* (*citing Cole, supra*, 661 F.3d at 937) (internal quotation marks omitted)).

15

VII. ANALYSIS.

## A. THE CREDIBILITY ASSESSMENT.

Plaintiff argues that this case should be remanded to the Commissioner so that the ALJ may consider the entire record of objective evidence that provides support for his pain complaints and conduct the analysis required under the Social Security Administration's own regulations, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, Social Security Ruling (SSR) 96-7p (July 2, 1996) and the Sixth Circuit decision in *Rogers v. Commissioner of Social Security,* 486 F. 3d 234, 247 (6th Cir. 2007). Inherent in this argument is Plaintiff's challenge to the ALJ's credibility assessment.

### 1. THE LAW

An ALJ's credibility findings are entitled to considerable deference and should not be lightly discarded. *Kendrick v. Astrue,* 886 F.Supp.2d 627, 637 (S.D.Ohio,2012) (*citing Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir. 1993)). The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [a claimant] are reasonable and supported by substantial evidence in the record." *Id.* at 637-638 (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 476 (6th Cir.2003) (brackets added)). In evaluating a claimant's assertions of disabling pain, the ALJ must engage in a two-step process. *Id.* (*citing Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994)).

First, the ALJ should determine whether the claimant has a medically determinable impairment which could reasonably be expected to produce the pain. *Id.* (*citing Felisky*, 35 F. 3d at 1038-1039).

Second, the ALJ should evaluate the severity of the alleged pain in light of all relevant

16

evidence including the factors set forth in 20 C.F.R. § 404.1529(c).  *Id.* (*citing Felisky*, 35 F. 3d at

1039–1041).  The seven factors listed in 20 C.F.R. § 404.1529(c) are:

1. daily activities;

2. the location, duration, frequency and intensity of the symptoms;

3. precipitating and aggravating factors;

4. the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms;

5. treatment, other than medication, you receive or have received for relief of your pain;

6. any measures used to relieve the symptoms; and

7. other factors concerning the functional limitations and restrictions due to the symptoms. *Id.* at 638, fn. 8.

**2.  THE APPLICATION OF THE LAW TO THE FACTS OF THIS CASE.**

The Magistrate finds that because Plaintiff's complaints regarding symptoms, or their

intensity and persistence, were not supported by objective medical evidence, the ALJ was required

to make determination of Plaintiff's credibility in connection with his complaints based on a

consideration of the entire case record.  The regulations require that the ALJ explain the credibility

determinations in his or her decision with sufficient specificity as "to make clear to the individual and

to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the

reasons for that weight."

Here, the ALJ did not misapply the two-part pain standard in assessing Plaintiff's credibility

and substantial evidence supports that conclusion.  When reviewing the ALJ's decision, the

Magistrate finds that the ALJ's approach to assessing Plaintiff's pain was methodical.  She found

specific reasons for discounting Plaintiff's credibility, supported by the evidence in the case record

and making it sufficiently clear to subsequent reviewers the weight she gave to Plaintiff's statement

and why she attributed such weight.

Initially, the ALJ articulated that she relied upon the two-step process and SSR 96–7p that required her to consider Plaintiff's medical condition and whether it gave rise to the level of pain and limitations alleged.  The ALJ mentioned Plaintiff's diagnosis and his complaints of pain.  What followed was a succinct, yet carefully crafted review of the medical records and the effects of symptoms including pain that were reasonably attributable to the medical condition.

The ALJ recognized the objective medical evidence that supported the finding of the location, duration and intensity of Plaintiff severe back impairment; however, she also noted the objective medical evidence that tended to show the impairment was not of the severity projected by Plaintiff. The ALJ considered Plaintiff's use of medication to alleviate the symptoms, the MRIs ordered by Dr. Collis, the interpretations made by Dr. Collis and Dr. Poirier and the office visits with Dr. Schnell and Scroggins for treatment of back pain.  The ALJ considered that the MRI showed a normal thoracic spine and that the diagnostic evidence showed a mild degree of canal stenosis and possible herniation and that during a period of time, Plaintiff used a cane for ambulation (Docket No. 7, pp. 27, 28, 29 of 507).  The ALJ acknowledged that Plaintiff had surgery and she recognized the post-surgery degenerative changes followed by the administration of several epidural blocks, the prescriptions of pain medication, the use of a Lidoderm patch and additional  diagnostic testing (Docket No. 7, pp. 28-29 of 507).

In summary, substantial evidence supports the ALJ's general negative credibility determination where it appears that the ALJ considered the entire record in assessing Plaintiff's pain complaints and the objective medical evidence supporting Plaintiff's complaints therein.  The Magistrate declines to remand the case for reconsideration because the ALJ has already accomplished what the regulations require.  The Magistrate also declines to reject the ALJ's detailed credibility

determination that is justified based on the evidence.

Turning to whether the ALJ considered the second and fourth factors set forth in *Rogers, supra*, the Magistrate acknowledges that the regulations do not allow the Commissioner to short-circuit the determination process and accordingly, the ALJ should have evaluated the location, duration, frequency and intensity of the symptoms as well as the type, dosage, effectiveness and side effects of any medication taken to alleviate the symptoms.  Upon review of the ALJ's decision in its entirety, the Magistrate concludes that the ALJ did not engage in a detailed discussion of the first and second factors in *Rogers, supra,* 486 F. 3d at 247-248.  Nevertheless, the ALJ considered the second and fourth factors adequately.  The record reveals that the ALJ articulated that Plaintiff's lumbar spine was compromised, that he suffered with intense back pain and that the pain had persisted since 2001 (Docket No. 7, pp. 28-29 of 507).  Likewise, the ALJ considered that Plaintiff was prescribed Ultram, cortisone shots, epidural blocks and other pain medications, all with the purpose of relieving the pain in the lumbar spine (Docket No. 7, pp. 28-29 of 507).  As such, the Magistrate finds no error with that segment of the ALJ's determination.

### B.  THE HYPOTHETICAL QUESTION.

Plaintiff suggests that the answers to the hypothetical questions did not constitute substantial evidence since the question itself did not accurately portray him or his limitations.  Plaintiff argues that in particular, at least one hypothetical question should have considered his debilitating back impairment and post-surgical disc herniation that resulted in the ability to stand for no more than ten minutes, his chronic pain, his inability to ambulate without assistance, his poor motor and sensory deficits and his weakness in the lower extremity muscles

### 1.  THE LAW.

The logical underpinnings for the requirements that the hypothetical question posed to the VE

19

must include the claimant's impairments are that without an actual depiction of the limitations, the VE will not be able to accurately access whether jobs do exist that the claimant can perform. *Schroeder v. Commissioner of Social Security*, 2012 WL 7657831, *18 (N.D.Ohio,2012) *adopted by,* 2013 WL 821240 (N.D.Ohio,2013) (*citing Lamtman v. Commissioner of Social Security*, 2012 WL 2921705, *14 (N.D.Ohio,2012) *adopted by,* 2012 WL 2921646 (N.D.Ohio,2012)). The hypothetical question posed to a VE for purposes of determining whether a claimant can perform other work should be a complete assessment of the claimant's physical and mental state and it should include an accurate portrayal of the claimant's physical and mental impairments. *Id.* (*citing Lamtman*, 2012 WL 2921705, at *14) (*citing Farley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir.1975) (per curiam)). Stated differently, the hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *Kline v. Astrue,* 2013 WL 1947164, *3 (N.D.Ohio,2013) *adopted by,* 2013 WL 1946201 (N.D.Ohio,2013) (*See Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir.1987)).

Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *Id.* (*See Blacha v. Secretary of Health & Human Services*, 927 F.2d 228, 231 (6th Cir.1990)). In fashioning a hypothetical question to be posed to a VE, the ALJ is required to incorporate only those limitations that he or she accepts as credible. *Id.* (*citing Griffeth v. Commissioner of Social Security*, 217 Fed. Appx. 425, 429 (6th Cir.2007) (*citing Casey, supra*, 987 F.2d at 1235)).

For the VE's testimony to be reliable, it must take into account limitations or impairments that are medically undisputed and could seriously affect Plaintiff's ability to engage in alternate employment. *Id.* at *19. Where the ALJ relies upon a hypothetical question that fails to adequately

20

account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence.  *Id.* at * 18 (*See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir.1994)).

### 2. THE APPLICATION.

Plaintiff's contention that the ALJ failed to pose a hypothetical question that reflected all of his limitations is without merit.  The ALJ's decision acknowledged that Plaintiff's condition could cause him to suffer the symptoms alleged but noted that the pivotal question was whether Plaintiff's symptoms occurred with such frequency, duration and severity to preclude all work. The ALJ also acknowledged that she was required to take into account limitations or impairments that were medically undisputed and could seriously affect Plaintiff's ability to engage in alternate employment. To that end, the ALJ properly considered all of the relevant medical evidence.

With the exception of the issue surrounding Plaintiff's back impairment and its pain limitations, the ALJ was free to reject Plaintiff's conclusion that he could stand no more than ten minutes, that he could not ambulate without assistance, that he had poor motor and sensory deficits and weakness of the lower extremity muscles.  None of these allegations, either individually or in combination with each other, were medically determined to result in a debilitating impairment that imposed more than a mild limitation on Plaintiff's functional limitations.  When portraying Plaintiff's physical and mental health, the ALJ did not err in failing to include in the hypothetical question assertions she deemed incredible or medically disputed.

### 3. NEW AND SEPARATE MEDICAL CONDITIONS.

Plaintiff directs the Court to the post-surgical January 30, 2006-lumbar MRI that demonstrated a herniation consistent with Dr. Collis' statement that Plaintiff had a sclerotic L4 interspace separate from the post-laminectomy syndrome.  Plaintiff contends that the ALJ failed to acknowledge this new and separate capacity capable of further reducing his functional capacity.

21

Contrary to Plaintiff's assertion, the ALJ did not fail to mention or disregard this confirmation of Dr. Collis' finding.  The ALJ acknowledged the post-surgical MRI and the paracentral disc herniation at L4-5 and the ALJ considered whether the results from this MRI would assist Plaintiff in determining his disability status (Docket No. 7, p. 29 of 507).  Clearly,  the ALJ did not find the results from the MRI either probative of disability or *per se* disabling.  Accordingly, the undersigned Magistrate concludes that this case should not be remanded to the Commissioner to entertain the possibility that Dr. Collis' interpretation of the January 30, 2006-MRI is capable of reducing Plaintiff's functional capacity.

### V. CONCLUSION.

For the foregoing reasons, the Magistrate affirms the Commissioner's decision denying Plaintiff's eligibility for DIB benefits.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 4,  2013

22